[Civ. No. 4870.   Third Appellate District.—May 22, 1933.]

GEORGE H. RINER, Appellant, v. W. A. VERNON et al.,
Respondents.

Lovett K. Fraser for Appellant.

H. G. Crawford for Respondents.

PLUMMER, J.—Action by plaintiff on account of alleged wrongful eviction from a barber-shop, by the defendants. The defendants had judgment, and the plaintiff appeals.

The record shows that the plaintiff George H. Riner was at one time running a barber-shop in the Clear Lake Highlands, Lake County, about four miles from Lower Lake. The defendant Mildred Vernon owned a vacant barber-shop in Lower Lake. This property had been deeded to her by her husband, W. A. Vernon. It appears that the defendant W. A. Vernon and the plaintiff had a conversation in relation to the plaintiff renting the barber-shop in question. The barber-shop required repairs and fixing up. The negotiations between the defendant W. A. Vernon and the plaintiff George H. Riner resulted in the barber-shop being offered to the plaintiff free of rent until on or about the first day of May of the following year. This appears to have been in consideration of the fact that the plaintiff, who undertook the repair and fixing up of the barber-shop, would have to expend considerable money. On or about August 21, 1930, the plaintiff, after spending some $200 in fixing up the barber-shop, took possession thereof and conducted the business as a barber therein until on or about the fifth day of December, 1930. The record shows that Mildred Vernon knew that the plaintiff had taken possession of the barber-shop. The record also shows that both defendants understood that the plaintiff was to have the use of the barber-shop until the first day of May, 1931, without the payment of any rent. That thereafter, and on or about the fifth day of December, 1930, the plaintiff was arrested and taken to jail at Lakeport, and stayed there until about the 20th of December, 1930, when he was released. While the plaintiff was in jail at Lakeport the defendants rented the barber-shop to another party at $15 per month. The record shows that during the time the plaintiff was conducting business in the barber-shop his earnings amounted to about $35 per week. Upon the

plaintiff's return from Lakeport he demanded possession of the premises, which was refused. This action followed.

There is some testimony in the record that the plaintiff was to have possession of the premises after the first day of May, 1931, at the rental of $10 per month. The undisputed testimony, however, is that all parties understood that the plaintiff was to have possession of the premises until the first day of May, without the payment of any rent. In some portions of the testimony it is referred to as "during the winter months".

The court found, among other things, that the defendants did not wrongfully evict the plaintiff from the premises, and did not place another tenant in possession of the premises, against the will and without the consent of the plaintiff; also found that the plaintiff was not compelled to vacate said premises, and further found that plaintiff intended to, and did, on or about the thirteenth day of December, 1930, voluntarily surrender the possession of the said barber-shop and premises, as well as the key thereto, to the said defendants; that such voluntary surrender terminated any tenancy which he may have held. This finding is challenged by the appellant as not being supported by the testimony, and appears to us to be well taken.

As we have stated, the defendant W. A. Vernon told the plaintiff he could have the property for the winter months free of rent. The record shows that the defendant Mildred Vernon knew that the plaintiff was in possession of the property; that he was to have the property until May 1, 1931, free of rent, and stated that she did not intend to take any action to dispossess the plaintiff prior to that date, although she was not satisfied with having the plaintiff occupy the premises. Her consent, however, that he should remain until the 1st of May, in possession of the leased premises, is sufficiently shown by the record.

The plaintiff being rightfully in possession of the premises for the time mentioned, even though it be considered as a tenancy at will, was entitled to notice to vacate, as provided by section 789 of the Civil Code, which admittedly was not given.

Just preceding the arrest of the plaintiff it appears that the sheriff who made the arrest told the defendant W. A. Vernon to ask for the key and the following thereupon

took place between the plaintiff and the defendant W. A. Vernon: "Q. At the time Mr. Riner passed the key over to you, did he say anything to you? A. No. Q. About the key or possession of the premises? A. The only thing he said was 'I'll be back tomorrow,' or 'I'll be back in a couple of days. Somebody is going my bail.' Outside of that nothing was said." As to this transaction the plaintiff testified as follows: "Q. Now, what conversation did you have with Mr. Vernon at that time? A. Mr. Jones was standing out on the sidewalk; he told me to 'come on'. I met Mr. Vernon in the door when I was coming out. Mr. Vernon said, 'George, give me the key; I will look after everything while you are gone.' I said, 'I got some towels from the Napa Steam Laundry; please put them in a box for me and tell the man I will pay for them when I come back.' That was all that was said."

On or about the twelfth day of December, 1930, while the plaintiff was at Lower Lake having his hearing on the charge presented against him, the testimony shows the following: "Q. When did you first learn Mr. or Mrs. Vernon, or either of them, had put any one in possession of the barber shop? A. On the 12th day of December. Q. 12th day of December. What happened on that day? A. I was brought from here to Lower Lake on my hearing, on my case. While we were there, there was—Uncle Bill Hale told me; he says, 'I got your property here in the jail locked up,' and I says, 'What for?' and he says, 'Well, they got another barber down at the barber shop,' and I said, 'Who got him?' He said, 'I understand Mr. Vernon did.' I says, 'That's funny, I didn't know anything about it.' At that time Mr. Vernon walked up in the front door of the courthouse, and we were just coming out. Q. And did you have a conversation with him then? A. I did. Q. What did you say and what did he say? A. I said, 'What's the big idea carrying my things out?' He said, 'I didn't do it.' I said, 'Who done it?' He says, 'Herb Jones did.' I said, 'I understand you got a barber in the barber shop.' He says, 'Yes, and he is going to stay there, too.' I said, 'All right, we are going to see about it.' I asked the sheriff for permission to go over. He said, 'Sure.' He drove us down. When we got down there, Mr. Vernon was inside the shop, and the barber. . . . So I walked up to the

barber, and I said, 'Riner is my name.' He said 'Wheeler is mine.' I said, 'I understand you are doing the barber work here.' He said, 'Yes.' I said, 'How did you get it?' He said, 'Through Mr. and Mrs. Vernon.' He says, 'I don't want you to get mad at me, Mr. Riner. I had nothing to do about this. If I had known, I wouldn't have come.' I said 'I am not mad at you, Shorty, at all.' And I turned around, and Mr. Vernon was sitting in the barber shop, and you (Lovett K. Fraser), spoke up and you said, 'Mr. Vernon, don't you know you can't put a man in another man's place of business without giving him notice?' And he says, 'It is not leased, he's got no lease.' Well, you spoke up and said, 'Why did you tell him he could come and stay until the 1st of May?' and Mr. Vernon said, 'Yes, providing he kept the place clean.' And the Shellane plant was running. I just put in a new tank of gas, and I asked for the key. Q. This barber was using your Shellane plant? A. Yes. Q. And your hot water tank? A. Yes. Q. And you asked for the key? A. I asked for the key. I says, 'Where is the key to this plant?' The barber spoke up, 'Yes, it is over in the drawer,' and I got it and I turned the hot water off and fire, and locked the Shellane plant up, and I turned and gave the key to the deputy sheriff in charge, and said, 'You keep the key.'" A few days afterwards the following conversation took place in the presence of Carl Hale, Mr. Wheeler, Mr. Vernon and plaintiff: "Q. What conversation did you have with Mr. Vernon at that time? A. Mr. Vernon was standing in front of the garage door and the barber was standing next to him, and I walked up to the barber; I said 'Shorty, I will be ready to take possession of the shop Monday.' Mr. Vernon spoke up and said, 'No, you don't; you can't come back in here to do any work.' Q. Did you give anybody authority to take that personal property out of the barber shop? A. No, sir."

As to the key transaction, the defendant W. A. Vernon testified as follows: "Q. You recall a conversation had at the barber shop premises at the time Mr. Riner turned the key over? A. Yes. Q. All I want was what happened in the barber shop in the presence of Mr. Riner. A. Well, I walked in with Mr. Jones. Q. Walked in where? A. In the barber shop; right behind Mr. Jones. What took me

in there, he told me he was going to take Riner out. I told him that Riner was in there, and was conducting not a very good place; my wife didn't want him in there. And he said, 'Follow me in and ask for the key and possession of the property', which I did. I asked him for the key, and Mr. Jones asked him to get his hat, and I said, 'Mr. Riner, please give me the key.' Q. Did Mr. Riner reply? A. He stuck his hand in his pocket and handed me the key: He said, 'Now, there are thirteen towels here that belong to the Napa Steam Laundry, which I wish you would give. the Napa Steam Laundry', which they paid him for, but he told me they would come and get them. Q. At the time Mr. Riner passed the key over to you, did he say anything to you? A. No. Q. About the key or possession of the premises? A. The only thing he said was, 'I will be back tomorrow', or, 'will be back in a couple of days; somebody is going my bail.' Outside of that nothing was said.''

There was other testimony to the effect that Mr. W. A. Vernon simply asked, as he stated, the plaintiff Riner, for the key, and did not say anything about possession, and that after he asked for the key, Mr. Riner gave it to the defendant W. A. Vernon, and that at the time the key was delivered, Mr. Riner said he would be back in a couple of days.

As stated by the appellant, there is not a particle of evidence in the record that plaintiff voluntarily abandoned the place. He was arrested by the sheriff, and as he was being taken to the jail, gave the key to W. A. Vernon so he could look after the place while the plaintiff was gone. Riner stated at the time he would be back "tomorrow or in a couple of days". The plaintiff left all his belongings in the barber-shop and gave no one permission to move them. He demanded possession of the place as soon as he heard the Vernons had rented it to another barber. The evidence, without contradiction, shows that the plaintiff expended the sum of $200 in repairs and making the place suitable for conducting the barber business; that he placed in the shop a Shellane plant and other fixtures necessary to the conducting of the business; that he was earning approximately $35 a week; that no notice was ever given by the defendants to vacate the shop, and therefore, if only

a tenancy at will, the plaintiff was wrongfully deprived of the possession of the barber-shop.

We have omitted the testimony leading up to the renting of the shop; the fact that it was vacant prior to its being leased to the plaintiff; that it was in a condition of disrepair; and also, as to the title to the premises—because that testimony has no bearing upon the issue determinative of this case.

We have only set forth the undisputed testimony, which shows that the finding of the court as to the plaintiff having voluntarily surrendered possession of the premises, has no support in the record. ■ The finding of the court that the plaintiff did not have a lease on the premises is not supported by the evidence. The contention of the respondents that the plaintiff did not have a lease is based upon the fact that there was no written instrument of lease. There is no contradiction of the fact that the plaintiff was told he could have the premises until the first day of May, 1931, without payment of any rent. This was in consideration of two facts: First: That the plaintiff would necessarily have to expend a considerable sum of money in making the premises fit for use; and, second: That the plaintiff was a stranger and would have to build up a business.

As we have seen, there is nothing in the record indicating an intent to abandon the barber-shop by the plaintiff, and the mere delivery of the key thereto by the plaintiff to W. A. Vernon is insufficient to support the finding of the court.

In the case of *In re Mullings Clothing Co.*, 238 Fed. 58 [151 C. C. A. 134, L. R. A. 1918A, 539], it is held that such fact is insufficient to support a finding of abandonment or surrender of leased premises, the language of the court being: "The mere acceptance of the keys is not in itself sufficient to show an acceptance or a surrender. (Citing *Stearn* v. *Thayer*, 56 Minn. 93 [57 N. W. 329]; *Lucey* v. *Wilkins*, 33 Minn. 441 [23 N. W. 861]; *Bowen* v. *Clarke*, 22 Or. 566 [30 Pac. 430, 29 Am. St. Rep. 625].)"

To the same effect is the text in 35 C. J. 1092, section 279.

In *Schwartz et al.* v. *McQuaid*, 214 Ill. 357 [73 N. E. 582, 105 Am. St. Rep. 112], the effect of mere delivery of a key is considered, and it is there held that a delivery

of a key is not sufficient to support a finding of abandonment or surrender of premises.

In the case of *Zautz* v. *Sebrean*, 59 Cal. App. 781 [211 Pac. 834], the court having before it the question of accepting keys to premises and the taking of possession thereof without any further act, held that it did not constitute an acceptance of surrender or abandonment of the premises, the language of the court being as follows: "The mere act, therefore, of accepting the keys and taking possession did not constitute a rescission on their part, but rather, an assertion by them of the right given under the lease, and one which the lessees themselves acknowledged when they requested that the defendants take possession." (Citing a number of authorities.) The opposite of the rule is likewise true, that where a lessee requests the lessor to take possession, as was the case, for a temporary purpose, no finding of abandonment can be based thereon.

The text in 16 Ruling Case Law, page 1155, section 675, is based upon facts precisely similar to those presented in the instant case. The text, supported by authorities cited in the footnotes, is as follows: "So the delivery to the landlord of the key to enable him to take care of the building and its contents while the tenant is confined in jail does not constitute a surrender so as to deprive the tenant of the right to sue for a trespass on the premises." The case cited in the footnotes was where the lessee had been arrested for violating the prohibition act, delivered the keys to the landlord with a request to look after the premises until he returned. Possession of the premises denied by the landlord; abandonment and surrender pleaded, with the result as we have just stated.

It follows from what has been said that the judgment of the trial court should be reversed, with directions to the trial court to proceed and determine what damages the plaintiff has suffered by reason of being deprived of the use of the premises in question from on or about the twenty-first day of December, 1930, until the first day of May, 1931.

And it is so ordered.

Thompson, J., and Pullen, P. J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 20, 1933.